CLAYTON and others *v.* THE SCHOONER ELIZA B. EMORY

*(Circuit Court, D. New Jersey.   November 10, 1880.)*

1. PART OWNERS—REMOVAL OF MASTER.—The majority in interest of the owners of a vessel have the power to remove the master, whether he be a part owner or not, and to resume possession of such vessel at their own pleasure.

2. SAME—SAME—WRITTEN AGREEMENT.—In the case of a part owner only a written agreement, entitling such part owner to possession, can defeat the exercise of such right.

3. SAME—"SAILING RIGHT"—ESTOPPEL.—SPECIFIC PERFORMANCE.—A contract for the sale of a "sailing right" by the part owner of a vessel is not susceptible of specific enforcement, either by way of estoppel or by a direct proceeding for that purpose.

4. SAME—SAME—BREACH—REMEDY.—The only remedy for a breach of such contract, if any, is an action for damages.

   *In the Matter of the Schooner Eliza B. Emory,* 3 FED. REP. 241, *reversed.*

Appeal by libellants from the decree of the district court in admiralty.

*Flanders & Grey,* for libellants.

*J. Warren Coulston,* for claimants.

McKennan, C. J.   The libellants represent the majority in interest of the owners of the schooner Eliza B. Emory, and have brought this suit to obtain possession of the vessel.   It is not denied that, under ordinary circumstances, this right will be enforced against the minority interest in a vessel, in favor of the majority, but it is contended that John B. Clayton, whose interest must be united with that of the other libellants to make up a majority of the proprietary shares of the vessel, is estopped from asserting his right as owner, and that, therefore, a majority of the owners is not represented in the libel.

John B. Clayton was one of the original owners of the Eliza B. Emory, and sailed her for some time as master.   In April, 1874, Clayton sold to Weeks, as respondent, one-sixteenth for $1,750, as a "sailing right of the vessel," and executed a bill of sale in the ordinary form for the sixteenth part of the vessel.   Weeks was then mate, took command, and sailed the vessel until the filing of this libel.   It is alleged that the value of a sixteenth was considerably below $1,750, and that the difference between the real value of such interest and the sum paid was the consideration of the "sailing right."   Hence it is urged that John B. Clayton, having subsequently acquired another interest in the vessel, cannot gainsay the right of Weeks to retain possession of her. The only ground upon which an estoppel can be supported, if at all, is to be found in the testimony of Weeks, which is to the effect that Clayton offered to sell him one-sixteenth "as a sailing right of the vessel," and that he bought that interest at more than it was worth, because he understood that he was thereby acquiring the "sailing right;" or, in other words, that if Weeks bought a sixteenth he would thereby acquire a right to the possession of the vessel, and to sail her as master. Now this is not the statement of a fact within the knowledge of one party upon whose representation of its existence the other party relied and was misled, but it was the statement of a legal result as to which both parties might form their own judgment, as they had like means of information respecting

it. Weeks must be presumed to have known that the legal right to the possession and control of the vessel pertained to the majority interest in her, and that he could acquire the right to sail her only from this interest. He is not in a position, then, to invoke the doctrine of estoppel, because, if he has made a futile contract, with his eyes wide open, he cannot secure indemnity for a consequent loss by an unauthorized retention of the vessel.

Indefinite as is the testimony of Weeks, I think that, when the whole of the evidence is considered, it imports only an agreement, at the time of the purchase by Weeks, that he should succeed Clayton in command of the vessel. Clayton so testifies, and it is not without support in the testimony of Weeks, when he says that Clayton agreed that he should "go in her," but did not recollect what he said. I think it is more than probable that the illusory "sailing right" hath this extent no more. Accordingly Clayton turned over the possession of the vessel to Weeks, who sailed her thereafter as master, with the acquiescence of the other owners. He thus got all that he bargained for, and is without justification for his detention of the vessel.

The absolute right of the owners of a vessel to displace the master, and so reclaim possession of it, is so well settled now as to be incontestable. It rests upon reasons of public policy which are peculiarly applicable to that species of property. It may be exercised without cause, even against a master, in violation of the contract engaging him. Thus, in *Montgomery* v. *The Owners of the General Greene*, Bee's R. 388, Judge Hopkinson affirmed the right of the owners to dismiss, at their pleasure, a master who had been employed for a particular voyage, whose cargo was on board, for which he had signed bills of lading, and who was all ready and just about to sail. In affirming the decree the high court of errors and appeals say, (*Montgomery* v. *Henry*, 1 Dall. 51:) "As to the other point, the dismission of the captain, we are of the opinion that, upon a general retainer for no particular voyage, the captain may be dismissed at any time without cause assigned;

but that where there is a charter-party, bills of lading, and a particular voyage agreed upon, though the owners may dismiss the captain, yet they would be liable in a common-law court."

But the master here is also a part owner. Does that give him any better right to hold the vessel than he would otherwise have? A decisive answer is furnished by section 4250 of the Revised Statutes. It is there enacted that the majority ownership of a vessel shall have the same power to remove a master, who is also part owner, as such majority, if owners, have to remove a master not an owner; but that they "shall not apply where there is a valid written agreement subsisting, by virtue of which such master would be entitled to possession."

This not only confers upon a majority of owners the absolute power to remove a part owner from the command and possession of a vessel, because such power is exercisable by them against one who is not an owner, but by the clearest implication it enacts that nothing but a written agreement, entitling a part owner to possession, shall be available against this right of the majority. Now, if such a contract in its most comprehensive aspect, as is alleged here, had been set up against all the libellants, would it not be clearly insufficient, under the statutes, to defeat their right to the control and possession of the vessel? Can it, then, have any greater effect against only one of them? Obviously, such a discrimination has not the slightest.

It results, therefore,—

1. That the majority (in interest) of the owners of a vessel have the power to remove the master, whether he be part owner or not, and to resume possession of her at their own pleasure.

2. That in the case of a part owner only a written agreement, entitling such part owner to possession, can defeat the exercise of such right.

3. That the contract set up here is not susceptible of specific enforcement, either by way of estoppel or by a direct proceeding for that purpose, and hence is no defence against the libel.

4. That the only remedy of the respondent for a breach of such contract, if he has any, is an action for damages. There must, therefore, be a decree for the libellants according to the prayer of their libel, which will be prepared.