## JENKINS S. S. CO. v. PRESTON.

(Circuit Court of Appeals, Sixth Circuit.   April 19, 1911.)

### No. 2,093.

1. CORPORATIONS (§ 407*)—REPRESENTATION BY OFFICERS—CONTRACTS MADE BY GENERAL MANAGER.

The general manager of a steamship company, who was also secretary and treasurer and a large stockholder, and had full personal charge of the business which the company was organized to transact, was a general officer as to all such matters with prima facie authority to do any act which the directors could authorize or ratify, and a contract made by him for the employment of a master for two seasons, under which the master served during one season with the knowledge of the directors and without objection, is binding on the company, and cannot be repudiated by it thereafter as made without authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1615–1619; Dec. Dig. § 407.*]

2. CUSTOMS AND USAGES (§ 14*)—APPLICATION AND OPERATION—EXCLUSION BY TERMS OF CONTRACT.

Evidence of a custom is admissible only where it adds to the contract an incident which, by virtue of such custom, is tacitly contained therein, and not when it is inconsistent with the contract and its effect contradictory to the provisions thereof.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 29; Dec. Dig. § 14.*]

3. CONTRACTS (§ 95*)—VALIDITY OF ASSENT—DURESS.

A written contract by which the manager of respondent steamship company employed libelant as master for two years, signed on board the vessel where libelant had gone to take charge, but pursuant to a prior agreement, cannot be avoided for duress on the manager's testimony that the vessel was surrounded by strikers in tugs who had imperiled his life, and that he signed in order to get the vessel in commission, upon libelant's refusal to accept the employment without such contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 431–440; Dec. Dig. § 95.*]

4. SHIPPING (§ 69*)—MASTER—ACTIONS FOR WAGES—DEFENSES—DISCHARGE FOR INCOMPETENCY.

Allegations of incompetency, inefficiency, and disobedience of orders against the master of a vessel considered, and *held* not sustained by sufficient evidence to justify the master's discharge before the expiration of his contract term or to defeat his recovery of wages for the remainder of the term.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 293–307; Dec. Dig. § 69.*]

5. ADMIRALTY (§ 118*)—MATTERS REVIEWABLE ON APPEAL—DISCRETION OF TRIAL COURT.

In an action by the master of a vessel who had been discharged before the expiration of his contract term of service to recover damages for breach of the contract, it was within the discretion of the court to determine whether a reference was necessary to determine the damages, and his action in refusing such reference is not reviewable on appeal.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775; Dec. Dig. § 118.*]

Appeal from the District Court of the United States for the Northern District of Ohio.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

186 F.—39

Action in admiralty by John R. Preston against the Jenkins Steamship Company. Decree for libelant, and respondent appeals. Affirmed.

Lawrence, Russell & Eichelberger, for appellant.

Goulder, Day, White & Garry and Holding, Marten, Duncan & Leckie, for appellee.

Before SEVERENS and KNAPPEN, Circuit Judges, and SATER, District Judge.

SATER, District Judge. The appellant, whose corporate name prior to 1906 was the Mack Steamship Company, seeks the reversal of the decree awarding the appellee his salary, with interest, as master of one of its steamships for the season of 1905.

In the spring of 1904 the American Association of Masters and Pilots on the Great Lakes struck to enforce certain demands made on the Lake Carriers' Association, of which the Mack Steamship Company was a member. That company and also the Pittsburgh Steamship Company were each seeking the services of appellee. As the result of a conference held at Cleveland, Ohio, by a representative of the last-named company, a representative of such association, and appellee, and of a telephone communication carried on in his presence by such representatives with the manager of the Mack Steamship Company, the appellee went to Buffalo, N. Y., to accept from that company a two years' employment as master of the William H. Mack, a prior engagement for a single season's service as such master having recently been canceled. On boarding the vessel in the Buffalo harbor, he asked for a written contract evidencing his employment for two seasons, whereupon the following instrument was executed and delivered to him by such manager:

"Buffalo, May 27, 1904.

"It is hereby agreed between J. R. Preston and the Mack Steamship Company that J. R. Preston is engaged by said company at a salary of $1,980.00 a season for two seasons.

"[Signed] Chas. O. Jenkins, Mgr."

The appellee immediately took command of the vessel, and on the same evening set sail. At the close of the season, about December 29th, he laid the vessel up in the port of Milwaukee, and on reporting at Cleveland was paid what was due him. His uncontradicted evidence is that he was then told by Jenkins that, although he had in the early part of the season caused some trouble in not submitting reports, he had overcome that, and should take charge of the vessel the following year. On January 16, 1905, in anticipation of his own re-election as manager at the coming annual meeting of the board of directors, Jenkins wrote to appellee expressing his great respect for him "as a gentleman of splendid principles," but notifying him that he need not expect reappointment as master. The reasons assigned for this action were the excessive size of appellee's bills for tugs, provisions, and wages, the stranding of his vessel three times, and his failure to report dock situations, although in this last respect he stated that, in consequence of vigorous instructions, there had been considerable improvement as the season advanced. The appellee conferred with Jenkins at

Cleveland about January 28th, and was then discharged. At that time the steamship company had five masters and but three boats. As most of the masters for the season of 1905 had been then engaged, the appellee was unable to obtain a position as master, pilot, or mate, or other profitable employment, and earned but a trifling sum within that year. He therefore sued for his salary.

The defenses are want of authority on the part of Jenkins, who was himself employed as manager from year to year only, to engage the appellee for more than a single season, the existence of a custom, well known to the appellee, to engage masters for a single season only, absence of a ratification of the contract by the company's board of directors, duress arising out of the serious strike situation in extorting a contract for two seasons, incompetency, inefficiency, and continual disobedience of orders, on account of which the company was caused great loss and expense.

[1] The directors of the steamship company had the power to authorize or ratify the employment of the appellee for two seasons. Jenkins was not only its general manager, but was also its secretary and treasurer, one of its large stockholders, and in 1904 a member of its board of directors. He testified that during that and the following season in everything that pertained to the boats owned by the company and to the company itself he was the company. He and another stockholder, for whom he acted, owned a majority of the corporate stock, and that person and the company's counsel, both of whom were directors, knew, as did Jenkins, that the appellee was in the company's service as a master. So exclusive was the manager's authority that during the season of 1904, notwithstanding the existence of a troublesome strike, no meeting of the board of directors, in so far as the record discloses, was held. He had full personal charge of the business which the company was organized to transact, with power to enter into and terminate contracts in respect thereto, and was a general officer of the corporation as to all such matters. It follows, therefore, that as such representative of the corporation he had power prima facie to do any act which the directors of the corporation could authorize or ratify, and consequently to employ the appellee. Sun Printing & Pub. Co. v. Moore, 183 U. S. 642, 651, 22 Sup. Ct. 240, 46 L. Ed. 366; Oaks v. Cattaraugus Water Co., 143 N. Y. 430, 436, 38 N. E. 461, 26 L. R. A. 544; Great Lakes Towing Co. v. Mill Transp. Co., 155 Fed. 11, 21, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769. The company did not disavow his authority, nor did its manager or any other of its representatives, at any time prior to the coming in of the answer, question or repudiate the contract as to any of its provisions, but, on the contrary, accepted the appellee's services and their fruits. It would be inequitable to allow the principal to stand by and make no inquiries and thus avail itself of a contract made in its behalf, and after part performance repudiate the contract as one made without authority. Story on Agency (4th Ed.) § 256; The Mary Elizabeth (C. C.) 24 Fed. 397; Martin v. Webb, 110 U. S. 7, 15, 3 Sup. Ct. 428, 28 L. Ed. 49. The manager, who was himself a lawyer and who must be presumed to have known the extent of his powers and the effect of their exercise, acted within the scope of his authority in employing the appellee. It

is also reasonable to assume, on the facts shown, that the directors knew that the contract of employment was for two seasons.

[2] Regarding the existence of a custom to engage masters for a single season only, it appears that at the time the contract was made there was a desire on the part of the company to break the strike. The manager is authority for the statement that masters were scarce, and that he was willing to take them on almost any terms. Some of the masters, on account of the unusual conditions induced by the strike, insisted on employment for more than a single season, through fear of the loss of their positions should the masters and pilots win in their strike, and were in consequence given contracts by their employers for a longer period. But, aside from this fact, this defense is without merit. Evidence to establish a custom is admissible only where it adds to the contract an incident which, by virtue of such custom, is tacitly contained therein, and not when it is inconsistent with the contract and its effect contradictory to the provisions thereof. The contract in question is not ambiguous or uncertain, and evidence of a custom to destroy, contradict, or modify it is irrelevant and unavailing. Menage v. Rosenthal, 175 Mass. 358, 56 N. E. 579; National Bank v. Burkhardt, 100 U. S. 686, 25 L. Ed. 766; Quarry Co. v. Clements, 38 Ohio St. 587; Chase v. Washburn, 1 Ohio St. 244, 59 Am. Dec. 623; Gibney v. Curtis, 61 Md. 201; Page on Contracts, § 604.

[3] The defense of duress in obtaining the contract rests wholly on the manager's testimony. He first denied, but subsequently admitted, having conversed with the representatives of the Lake Carriers' Association and Pittsburgh Steamship Company over the telephone prior to appellee's going to Buffalo to assume command of the vessel. He testified that the vessel, at the time the written instrument was prepared and delivered, was surrounded by strikers in tugs; that his life shortly before had been imperiled by them; and that, on appellee's refusal to take the boat out unless given a two-season contract, he prepared and delivered the instrument under protest. The appellee's version is that the instrument was prepared and delivered to him promptly, freely, and for the asking. The defense fails not only for want of preponderance of the evidence as to what occurred at that time, but because the manager's evidence, if accepted as true, does not make out a case of duress. The situation was not so critical as to interfere with appellee's reaching and boarding the vessel, although his attitude was that of a strike breaker, or with Jenkins' returning to the shore in safety after the appellee took command. The appellee was not responsible for the condition resulting from the strike, nor did he do any unlawful act or compel the manager to do what he acknowledges he did do, which was to yield to a demand which might properly be made and to which he had apparently previously assented, in order to get his vessel in commission at a time when, by so doing, he would contribute to the defeat of the strikers and advance the interests of his company. His declaration at the December settlement that the appellee should have charge of the boat for the coming year, his assignment of other reasons for the appellee's discharge, and his failure to allude to the circumstances under which the contract was executed, until the defense came in, are suggestive that the charge of duress is

an afterthought. In view of what constitutes duress which will avoid a contract, as defined in well-considered cases, this defense falls short. U. S. v. Huckabee, 16 Wall. 414, 21 L. Ed. 457; French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852; Radich v. Hutchins, 95 U. S. 210, 213, 24 L. Ed. 409; Cleaveland v. Richardson, 132 U. S. 318, 333, 10 Sup. Ct. 100, 33 L. Ed. 384; Mays v. Cincinnati, 1 Ohio St. 268; Domenico v. Alaska Packers' Ass'n (D. C.) 112 Fed. 554.

[4] The defenses of incompetency, inefficiency, and disobedience of orders may be considered together. They go to the size of his bills for tugs, provisions, and wages, the strandings and strikings of his vessel, collision of his vessel with two others, failure to report his whereabouts and dock situations, imperfect reports and records, lack of speed in moving his vessel, and the approval of a bill for goods which had not been delivered.

His expenditures for towage and provisions were greater than those of the company's other vessel, the Squire, which was larger than the William H. Mack. The tug bills were, of course, increased somewhat by strandings. However, the price paid for towage service and for a considerable part of the provisions used was that fixed by contracts made by the manager. As the appellee's vessel carried several cargoes of wheat, while the Squire carried none, his relative cost of towage was necessarily greater on account of the required movement of his vessel to a series of elevators in unloading a single cargo. There was also some expense incurred for tugs to break the ice. When in ports at which the company had no contracts for provisions, he was required to purchase on such terms as he could make. The wages paid were less than those paid for the sailing of the Squire. As reflecting on the cost of towage, provisions, and wages, it is further noted that the Squire was in commission from only about June 20th until December 10th or 12th. The stranding and striking of the vessel occurred where such accidents are most usual, in shallow water where silt and sand accumulate through deposits from small streams or shifting currents, and through the lowering of the waters of the lakes by winds. In some instances not only he, but the owners of the tugs who were to tow him into the harbors in question, believed he could safely enter. It is reasonably clear that he did not report all the occasions on which his vessel grounded or struck, but there is no satisfactory proof that his vessel was injured by any such mishaps, and it is conceded that he made protest in every known instance in which a loss was sustained which constituted the basis of a claim; but neither his failure so to report, nor a mere error of seamanship on his part, is sufficient to work a forfeiture of his wages. The Camilla, Swabay's Admiralty, Rep. 312. Two collisions, causing some injury to his boat, occurred by other vessels striking his while it was moored to the dock, but it is not shown that he was at fault or that the injury was of consequence. His reports as regards his whereabouts and dock situations were not made as frequently as ordered, and as regards other matters were somewhat crude and imperfect. There does not appear, however, to have been any substantial loss of time due to his failure to give greater information, or any loss of cargoes or any injury resulting from imperfect accounts or from his approval of a bill for goods which were not deliv-

ered. The cause of the needed repairs of the vessel is based on a process of reasoning rather than affirmative proof, the force of which is impaired by the fact that at the close of the season at Milwaukee, Jenkins, in connection with the appellee, inspected the vessel, except as to its bottom, and then entered no complaint as to its management or condition.

The appellee was not a stranger to Jenkins. He had been a licensed master for 28 years. He had at the time of his employment served in that capacity for eight seasons, and as mate for about ten years. The residue of his time he had worked as a ship carpenter. He had applied to Jenkins for employment for several seasons and produced references as to his skill as a navigator. Two days prior to the execution of the contract Jenkins had solicited his services. He gave the appellee no instructions before the vessel sailed as to the frequency of reporting his whereabouts and doings or of the course to be pursued in transacting the company's business. Instructions in these respects were imparted later by telegrams and letters, and were not always understood. The appellee was not a master of the highest skill, but he was a conscientious and reasonably efficient servant, and the steamship company had the opportunity of knowing and must have known of his standing as such at the time of his employment. Clear and satisfactory evidence is necessary to sustain the charge of incompetency; the onus probandi being on the shipowner. Lombard S. S. Co. v. Anderson, 134 Fed. 568, 67 C. C. A. 432. The evidence is not of such a character as to justify his discharge.

[5] Complaint is made that a reference to ascertain the damages suffered by appellee was denied. The record discloses an offer on his part to perform, reasonable diligence and some expense incurred to obtain other employment, a failure to procure it, the loss of his cost of living for the season, and earnings of an inconsequential amount. It was for the trial judge to say whether a reference should be made to ascertain and report the amount of recovery, or whether he would determine it himself. The Lopez (D. C.) 43 Fed. 95. The rule is well settled that, where the action of an inferior tribunal is discretionary, its decision is final. Earnshaw v. U. S., 146 U. S. 60, 68, 13 Sup. Ct. 14, 36 L. Ed. 887; Cape Fear Towing & Transp. Co. v. Pearsall, 90 Fed. 435, 437, 33 C. C. A. 161; Loveland's App. Proc. § 51.

The trial court committed no error, and the decree is affirmed.